(May 1, 1909.)

In re Guardianship of Estate and Persons of ELLENA MAY and LETHA JOAN CROCHERON, Minors. JOSEPH BABINGTON, Petitioner and Respondent. A. B. CROCHERON, Protestant and Counter-petitioner, Appellant.

[101 Pac. 741.]

GUARDIANSHIP—CUSTODY OF MINOR CHILDREN—RIGHT OF PARENT.

1. Under the provisions of sec. 5774, the surviving parent, who is competent to transact his own business and not otherwise unsuitable, is entitled to the guardianship of his minor children.

2. *Held*, under the facts of this case, that it appears the father is competent to transact his own business and that he is not otherwise unsuitable to have the guardianship of his minor children.

3. The case of *Andrino v. Yates*, 12 Ida. 618, cited with approval.

(Syllabus by the court.)

APPEAL from the District Court of the Third Judicial District for Owyhee County. Hon. Ed. L. Bryan, Judge.

Application to the probate court by the step-grandfather of two minor children for the appointment of himself as guardian of such children, to which application the father of the children enters a protest and applies to be himself appointed. Judgment in favor of the grandfather. Appealed to the district court, where the matter was tried anew and judgment entered in favor of the grandfather, from which judgment the father appeals to this court.

Judgment reversed with instructions to enter judgment in favor of the father.

C. P. McCarthy, and T. D. Cahalan, for Appellant.

"The father of the minor, if living, and in case of his decease the mother while she remains unmarried, being themselves respectively competent to transact their own business and not otherwise unsuitable, must be entitled to the guardianship of the minors." (Rev. Codes, sec. 5774.) The word "must" is mandatory, and confers the right upon the father in the most positive terms. (*In re Galleher*, 2 Cal. App. 364, 84 Pac. 352; *Markwell v. Pereles*, 95 Wis. 406, 69 N. W. 798; *Ex parte Miller*, 109 Cal. 643, 662, 42 Pac. 428; *In re Campbell*, 130 Cal. 380, 62 Pac. 613; *Hernandez v. Thomas*, 50 Fla. 522, 111 Am. St. 137, 39 So. 641, 2 L. R. A., N. S., 203; *Ex parte Davidge*, 72 S. C. 16, 51 S. E. 269; *Watts v. Lively* (Tex. Civ. App.), 60 S. W. 676; *Gilmore v. Kitson*, 165 Ind. 402, 74 N. E. 1083.)

"What is for the best interest of the infant is the question upon which all cases turn at last, . . . . and the answer is that the custody of the child is by law with the father unless it is apparent by satisfactory evidence that the best interest of the child demands that he should be deprived of that custody, and upon him who avers is the burden of proof; the presumptions are against it." (*Weir v. Marley*, 99 Mo. 484, 12 S. W. 798, 6 L. R. A. 672; *In re Scarritt*, 76 Mo. 565, 43 Am. Rep. 768; *State v. Libbey*, 44 N. H. 321, 82 Am. Dec. 223; *Commonwealth v. Briggs* (Mass.), 16 Pick. 204; *State v. Richardson*, 40 N. H. 272; *Rust v. Vanvacter*, 9 W. Va. 600.)

The witnesses for the petitioner do not pretend to say what Mr. Crocheron's general reputation was at the time of the trial, in the community in which he then lived. Their testimony related to a period of four or five years prior to the time of the trial. His competency and suitability at the time of his application are the questions to be considered. (*Parker v. Wiggins* (Tex. Civ. App.), 86 S. W. 788; *Hernandez v. Thomas*, 50 Fla. 522, 111 Am. St. 137, 39 So. 641, 2 L. R. A., N. S., 203.)

J. F. Nugent, and C. M. Hays, for Respondent.

In matters of this character the best interest, the welfare, and the happiness of the infant are the all-controlling questions. For three years and eight months appellant, by his own voluntary act, did not see these children; he has become a stranger to them. (*Andrino v. Yates,* 12 Ida. 618, 87 Pac. 787; *In re Lally,* 85 Iowa, 49, 51 N. W. 1155, 16 L. R. A. 681; *In re Gates,* 95 Cal. 461, 30 Pac. 596; *Merritt v. Swinley,* 82 Va. 433, 3 Am. St. 115; *Richards v. Collins,* 45 N. J. Eq. 283, 14 Am. St. 726, 17 Atl. 831; *Green v. Campbell,* 35 W. Va. 698, 29 Am. St. 843, 14 S. E. 212; *Jones v. Bowman,* 13 Wyo. 79, 77 Pac. 441, 67 L. R. A. 860; *Willet v. Warren,* 34 Wash. 647, 76 Pac. 274; *In re Campbell,* 130 Cal. 380, 62 Pac. 613.)

"The court upon which it devolves to determine the guardianship will pronounce upon that question in accordance with what appears to be for the best interest of the minor, taking into view not merely her temporal welfare, but the state of her affections, attachments, her training, education and morals." (*Foster v. Mott,* 3 Bradf. (N. Y.) 412; *Badenhoof v. Johnson,* 11 Nev. 87; *United States v. Savage,* 91 Fed. 490; *In re Carter,* 77 Kan. 765, 93 Pac. 584; *Kelsey v. Green,* 69 Conn. 291, 37 Atl. 679, 38 L. R. A. 473; 15 Am. & Eng. Ency. Law, 2d ed., 38, 187; 22 Cyc. 519; Schouler, Dom. Rel., 5th ed., sec. 248.)

Where bad character or reputation has once been established, the law presumes it continues, in the absence of proof to the contrary, and there is a legal presumption against any sudden change. (*Mynatt v. Hudson,* 66 Tex. 66, 17 S. W. 396; *Snow v. Grace,* 29 Ark. 138; *State v. Lanier,* 79 N. C. 622.)

"The selection of a guardian is, of necessity, largely within the discretion of the court appointing, and it is only where there is a clear abuse of that discretion that this court will interfere." (*In re Johnson,* 87 Iowa, 135, 54 N. W. 69; *Goss v. Stone,* 63 Mich. 319, 29 N. W. 735; *State v. Richardson,* 40 N. H. 272; Church on Habeas Corpus, sec. 446.)

SULLIVAN, C. J.—This appeal involves the guardianship of Ellena May and Letha Joan Crocheron, minor daughters of A. B. Crocheron. Said children are about eight and ten years of age, respectively, at the present time. It appears that the mother of these children, Mrs. Millie Crocheron, died about November 9, 1907, in Nampa, Idaho, and thereafter on December 24, 1907, Joseph Babington, the stepfather of the mother, filed his petition in the probate court of Owyhee county praying that he be appointed guardian of said minors. Said petition sets forth the death of the mother and, among other facts, states as follows:

"That A. B. Crocheron, father of said Ellena May and Letha Joan Crocheron, is an unsuitable person to be appointed their guardian, by reason of his indigent condition, and incapacity to properly provide for, and educate them; by reason of his insobriety and lack of integrity; by reason of the fact he abandoned said children in 1903 and has failed and neglected to provide for their support since said time, and by reason of his immorality. That he is without a home, and a nonresident of Owyhee county, where said children reside. That therefore, it is necessary and convenient that a guardian be appointed to the persons and estates of said minors."

On January 4, 1908, A. B. Crocheron, the father of said minor children, presented his petition to said probate court, showing that said minor children had a certain interest in the estate of their deceased mother, and prayed that he be appointed guardian of said minors, and thereafter, on January 13, 1908, filed his objections in said probate court to the appointment of Joseph Babington as guardian of said minors, alleging that he is the father of said minors, and denying that he is an unsuitable person to be appointed guardian of them, and denying all of the material allegations of the petition of Babington which go to show that he is not competent to transact the business of the minors and not otherwise suitable to become the guardian of said minors.

After hearing said matter, the probate court granted the petition of Babington, and appointed him guardian of said minors, and issued letters of guardianship to him. He thereupon took the oath of office as such guardian and was given custody of said minors. From that action of the probate court, the father appealed to the district court. A hearing was there had, a number of witnesses testified, and documentary evidence was introduced on the trial. The court thereafter made findings of fact and conclusions of law, and entered judgment against the appellant and sustained the action of the probate court. A motion for a new trial was thereafter made and overruled by the court. This appeal is from the judgment and the order overruling the motion for a new trial.

Only one error is assigned, and that is the insufficiency of the evidence to justify the finding of facts and conclusions of law, and the decision made by the court.

Under the provisions of sec. 5774 of the Rev. Codes 1909, the father is entitled to the guardianship of his minor children if he is competent to transact his own business and not otherwise unsuitable for that trust. Said section is as follows:

"Either the father or the mother of a minor, being themselves respectively competent to transact their own business, and not otherwise unsuitable, must be entitled to the guardianship of the minor."

The second finding of fact made by the court is as follows:

"That the said A. B. Crocheron is the father of said minors and is not indigent or incapable of properly providing for said minors, or of educating them"; and the third is as follows: "That the said Crocheron is not an immoral man." By the fourth finding, the court found, "That said Crocheron is a man of insobriety and intemperate habits; that he is addicted to the use of intoxicating liquors, and that he is lacking in integrity."

The evidence amply supports said findings 2 and 3, but the evidence does not support the fourth finding of fact, and there is no evidence whatever to show that said Crocheron

is lacking in integrity. The fact that a father is lacking in integrity—does not pay his debts—is no cause for depriving him of the guardianship of his children. The evidence shows conclusively that he is a man of honor and strict integrity in his dealings with his fellowmen. The petitioner undertook by his evidence to cast some reflection on Crocheron's integrity by showing that he had been elected assessor and tax collector for two terms in Owyhee county and that he was short in his accounts as such officer. The evidence also shows that when the matter was called to his attention, he at once put up sufficient money with the clerk of the board of county commissioners of said county to cover all shortage that could in any manner occur, and that the clerk failed to pay over said money on any shortage that was found against him; that he thereafter paid said shortage, whatever it was, a second time.

So far as his insobriety and intemperate habits are concerned, the evidence shows that he did drink some; that he at times became a little hilarious, but the evidence fails to show that because of his intemperate habits he was ever unfitted to perform his duties as an officer or to attend to his own business affairs. The evidence does not show that he was incompetent at any time to transact his own business, and nowhere shows that he is unsuitable to act as the guardian of said two minor children.

It appears from the record that Joseph Babington, the guardian appointed by the probate court, was the stepfather of Crocheron's deceased wife; that Crocheron was married to her in October, 1897, in Owyhee county; that she was the daughter of Mrs. Babington by a former husband; that the Babingtons have resided in Owyhee county for forty odd years. It appears that Crocheron was assessor of said county for two terms, commencing in 1891 and 1892, and also in 1895 and 1896, and was elected sheriff of that county in the fall of 1896 and held that office for two years; that thereafter he was for a time connected with a saloon in Silver City; thereafter he removed to Bruneau in said county with his family, and was appointed postmaster there; thereafter he went to his mother's ranch on Sinker creek in that

county and remained there for a time. It appears that his wife was very much attached to her mother and her stepfather, the Babingtons, and that the mother had been opposed to the marriage of Crocheron to her daughter; that they quite frequently visited the Crocheron ranch and often took Mrs. Crocheron home with them, without consulting her husband. It appears that the Babingtons were very much prejudiced against Crocheron and that during his term of office he was addicted to strong drink to some extent. All of the evidence as to his habit of drinking applies to his conduct some four years prior to the commencement of these proceedings, and the record contains no evidence showing that he has been addicted to the drink habit for about four years immediately preceding the commencement of these proceedings. Crocheron became discontented and was not pleased with the influence the Babingtons had over his wife, and he urged his wife to go with him to Pocatello, Idaho, or elsewhere, and make a home, but she absolutely refused to leave her stepfather and mother. This condition continued up to March, 1904, when appellant left his wife on his mother's ranch, and went to Pocatello and sought employment there. He was out of employment for some time, then worked in the railroad yards there, and then with a fence and bridge gang; also cut timbers for a coal mine and worked for a time near Minidoka and Twin Falls in Idaho, and on June 23, 1906, he went to work for his brother in law, a Mr. Hyde, at Thousand Springs, in this state, and continued to work for him until July 20, 1907. He thereafter went to Nevada on a prospecting trip and was at Elko in that state when informed of his wife's death. He immediately returned to Nampa, where his wife died, attended the funeral, paid all funeral expenses and desired at that time to take charge of his children, but through the importunities of Mr. Babington, the stepgrandfather of his children, and his wife, consented that they remain with them until the holidays of 1907 and 1908.

After Crocheron left his mother's ranch in March, 1904, Mrs. Crocheron and the children remained on the ranch for some months and then went to her old home, the Bab-

ington ranch on Reynold's Creek, in Owyhee county, and remained there for about fifteen months. She then went to Nampa in October, 1905, to place said children in school. The Babingtons purchased a house for her to live in at Nampa, and some articles of furniture, and Mrs. Crocheron resided there with her children from that time until her death in November, 1907, except during school vacations, which she spent on the Babington ranch at Reynold's Creek. It appears from the evidence that during the time that Crocheron was absent from his family, he wrote his wife frequently and urged her to come and live with him. She positively refused to do so. It also appears that during said time appellant sent her from month to month on an average about $30 per month; besides, she sold some horses that were on the ranch when Crocheron left, and also received the proceeds of the sale of a few head of cattle, from Crocheron's brother. The evidence shows that he sent her all of the money he earned during his absence except what was necessary for his own maintenance. If a month during that time went by without his sending her money, it was because he was not earning more than sufficient for his own support. The record fails to show that there was any trouble or dissension betweeen Crocheron and his wife during her lifetime except that caused by the wife's mother and her stepfather. They were evidently very much prejudiced against Crocheron, perhaps because of his being addicted to some extent to the drink habit during the time that he held the offices above mentioned and up to the time he left his family. Because of their prejudice and influence over his wife, the evidence shows that Crocheron was very anxious to take his family from Owyhee county and away from the influence of the stepfather and mother. There is no evidence in the record that would justify the appellant in leaving his family for forty-four months, and we cannot justify his conduct in that regard, although he furnished them all the money he earned except what was necessary to maintain himself. The fact of his leaving his family for that length of time, however, would not alone be sufficient to show that

he was unfit to have the guardianship of his own children. There is nothing in the record to show that he has not a tender regard for said children and that it would be against their interests to give him the guardianship of them. The record shows that he desires to place them with his sister, Mrs. Hyde, who, it is conceded by counsel for respondent, is among the very best women of Owyhee county. Mrs. Hyde was a warm friend of the deceased mother during her lifetime, and it also appears that the deceased mother stated to Mrs. Hyde that she desired in case anything happened to her that she (Mrs. Hyde) should take charge of the children. And it sufficiently appears that the children would be educated and well cared for if the father had control of them. A brother in law and two brothers, and, I think, the mother of the defendant reside in Owyhee county and are among the most respectable people of that county. No valid reason appears why the father should not be given the control of his children. Mr. Babington, the stepgrandfather of said children and Mrs. Babington, their grandmother, are respected and honored people, and no doubt have a great affection for the children, but that is no reason, under the law, why the father, he being ready, able and willing to properly care for and educate them, should be deprived of their guardianship.

The trial court found as a fact that said father was not indigent or incapable of properly providing for said minors and educating them, and that he is not an immoral man. Those findings, as before stated, are amply sustained by the evidence, but there is no evidence to show that he is so intemperate in his habits and so addicted to the use of intoxicating liquors as would deprive him, under the law, of the right to the guardianship of his daughters, and there is no evidence whatever to show that he is not a fit, proper and competent person to have the guardianship of them. The evidence clearly shows that the appellant is competent to transact his own business and that he is otherwise suitable to have the guardianship of said children. Therefore, under

the provisions of said sec. 5774, he is entitled to their care and custody.

In *Hernandez v. Thomas*, 50 Fla. 522, 111 Am. St. 137, 39 So. 641, 2 L. R. A., N. S., 203, the court said: "We have held. . . . . in accordance with the prevailing rule in American courts, that in awarding the custody of children the paramount consideration is the welfare of the child, rather than the technical legal right of the parent. While this is true, yet the court should not lightly and without good cause, invade the natural right of the parent to the custody, care and control of his infant child."

In *Re Galleher*, 2 Cal. App. 364, 84 Pac. 352, the court said: "It is well settled in this state that a parent is entitled to the guardianship of his child under the age of fourteen years, if he is a fit, proper and competent person, in preference to any other person." (See, also, *Markwell v. Pereles*, 95 Wis. 406, 69 N. W. 798.)

In *Ex parte Davidge*, 72 S. C. 16, 51 S. E. 269, the court holds that the welfare of the children must be considered, but that the parent's right to the love and influence of his children and the happiness they bring him must also be recognized and considered along with the interest of the children, and says:

"To separate the child from its parent is, therefore, a very strong measure, justified only by convincing proof of the parent's unfitness. No inflexible rule can be laid down by which unfitness may be determined. Each case must be decided on its own peculiar facts, but manifestly it is not sufficient to prove the poverty of the parent, and that financial benefits will come to the child from separation, or that the parent has faults of disposition and behavior somewhat unusual and trying. The conditions in life or the character and habits of the parent must be shown to be such that provision for the child's ordinary comfort and contentment, or for its intellectual and moral development, cannot be reasonably expected at his hands."

In *Watts v. Lively* (Tex. Civ. App.), 60 S. W. 676, the court said: "As aptly said by the trial court, the issue as

to what is for the best interest of the child is not determined by showing in whose custody it would likely be more comfortably reared. In order to overcome the presumption of law that the best interest of the child would be subserved by placing it in the custody of the father, who is responsible for its being, and who, under the laws of God and man, is held responsible for its care and protection, it must plainly appear that the father is unworthy of the trust.''

The supreme court of Indiana in *Gilmore v. Kitson*, 165 Ind. 402, 74 N. E. 1083, said: ''Courts must not be tempted to interfere with the natural order of family life except in special cases of extreme urgency. . . . . Paternal control of the family has been a fundamental principle in the history of mankind, and its free exercise, restricted only in the interest of humanity and good morals, is essential to the highest development of the race. What influence more likely to lead to despondency and self-destruction than the unnatural separation of a parent from his child, and what greater stimulus to worthy ambition and noble endeavor on the part of a father than the care and companionship of his motherless girl?''

In *Weir v. Marley*, 99 Mo. 484, 12 S. W. 798, 6 L. R. A. 672, the court held that where it was sought to deprive a father of the custody of his child, the burden is upon him who avers such unfitness; that the presumptions are against it.

In *Rust v. Vanvacter*, 9 W. Va. 600, the court said: ''The father is the natural guardian of his infant children, and in the absence of good and sufficient reasons shown to the judge, or court, such as ill-usage, grossly immoral principles or habits, want of ability, etc., is entitled to their custody, care and education. It seems that all of the authorities concur on this point. (Citing many authorities.) The custody of the minor will be assigned to the person having the right, unless it appears he is an improper person to take it.''

In *Andrino v. Yates*, 12 Ida. 618, 87 Pac. 787, this court held that where the legal right of a parent to the guardian-

ship of a child is not clear, the best interests of the child will govern the decision of the court. In the case at bar, however, the legal right of the father to the guardianship of said minors clearly appears, and under the law he is entitled to the guardianship of them.

The decision of the lower court must be reversed, and the cause remanded with instructions to the district court to make findings of fact and conclusions of law in accordance with the views expressed in this opinion, and to certify the same back to the probate court, with directions to appoint the said A. B. Crocheron guardian of said minor children.

Costs are awarded to appellant.

Stewart and Ailshie, JJ., concur.

(May 17, 1909.)

ON PETITION FOR REHEARING.

STEWART, J.—A petition for a rehearing has been filed in this case, and counsel urges with much zeal and vigor that the court failed to give due consideration to the evidence under the former decisions of this court. The argument of counsel is based upon two propositions: First, that the district court, in appointing a guardian under the statute, is vested with discretion; second, that there was a conflict in the evidence in this case as to the fitness and suitability of Crocheron for appointment as guardian; and there being a conflict, the findings of the trial court should not be set aside. Were the members of this court unacquainted with the usual zeal and enthusiasm with which counsel for the respondent always presents the cause of his client, the court would be unable to fully account for the extreme views counsel has taken as to what is shown by the record in this case. From counsel's contention we must at once conclude that the parent of a minor child has no natural right to the care and custody of such child, and that in the selection of a guardian for a minor the probate court is vested with the discretion to take the custody of a minor away from its

parents and give such custody to another, from the simple fact that in so doing the child may be surrounded with greater material comforts than if given to the parent, and by so doing may give effect to the wishes of the child, · although only eight or nine years of age. Such, however, is not the law.

The application for the appointment of a guardian of a minor under the laws of this state is a statutory proceeding, and the power of the court is fixed and determined by the statute. The usual powers exercised by courts of equity are not given to the court in making an appointment of a guardian under the laws of this state. (*In re Campbell*, 130 Cal. 380, 62 Pac. 613.) By the provisions of sec. 5770 of the Rev. Codes, the power of the court to appoint a guardian is limited to cases "of minors who have no guardian legally appointed by will or deed." In making such appointment sec. 5774, Rev. Codes, requires the court to appoint the father or mother as such guardian, if competent to transact his own business and not otherwise unsuitable. This section is compulsory as to requiring the father or mother to be appointed, if competent to transact his own business and not otherwise unsuitable. The statute leaves open for investigation the competency of the father or mother to transact his own business, and if thus competent whether he is otherwise unsuitable.

In this case there is no contention whatever and no evidence was offered to the effect that Crocheron, the father, was not competent to transact his own business. It is claimed, however, by respondent, and it is upon this point counsel so earnestly argue, that the evidence shows that Crocheron was otherwise unsuitable. Counsel seems to be able to gather great consolation from the case of *Andrino v. Yates,* and seems to think that that case is decisive of the question under consideration. In that case this court held: "Of course the legal rights of the parent must be respected, and the law contemplates that those rights may have been abandoned, surrendered, transferred or forfeited"; and in that case throughout this court clearly recognized

the legal right of the parent, but held that under the facts of that case the parent had abandoned, surrendered and forfeited her right to the custody of such child. But such is not the finding of the court or the proof in this case.

Counsel often quotes in his petition for a rehearing, as he did in his brief, that the "welfare of the infant is the polar star by which the discretion of the court is to be guided." This expression is not intended to convey the impression that in appointing a guardian the court can ignore the requirements of the statute and appoint a person other than the father and mother, unless such father or mother are incompetent to transact their own business or are otherwise unsuitable. This expression as well as the statute does not mean that the father is unsuitable because he is poor or because he is unable to provide as palatial a home or surroundings as some other person, or because at times he indulges in the use of intoxicating liquors, or because at times he is unable to or does not pay his debts. If the court has the discretion of taking away from the parent his legal right to the custody of a child from the mere fact that the parent is poor or unable at times to pay his debts when due, or that he indulges at times in the use of intoxicating liquors, then the legal right of the parent would be of but little force, and the courts might be kept busy transferring the custody of minors from their natural guardian, the parent, to strangers.

The supreme court of California in the case of *Guardianship of Salter*, 142 Cal. 412, 76 Pac. 51, in discussing this question, says:

"But even if the father were poor and unable to provide for the child as competently as his grandmother could, or would be compelled to maintain him at his place of abode in Los Angeles under the circumstances found by the lower court, these considerations would furnish no legal ground for depriving him of the custody of the child. They apply merely to its material and temporal welfare, and if such considerations were controlling they could in each instance where poverty was the misfortune of a parent be invoked

to deprive him of his child in favor of one more fortunately situated and better able to minister to its material comfort. Common humanity would be shocked at the serious maintenance of such a proposition.''

In this case the court finds that the father is not indigent, and is capable of properly providing for said minors and educating them; that he is not an immoral man, but he is a man of insobriety and intemperate habits, and is addicted to the use of intoxicating liquors and lacking in integrity. It will thus be seen, as stated in the former opinion, that the only finding which could be construed as supporting the conclusion reached by the court, that Crocheron was an unsuitable person to be appointed guardian, is the finding that he is a man of ''insobriety and intemperate habits and lacking in integrity.'' This finding, however, does not satisfy the requirements of the statute. In the first place, lack of integrity is not a legal ground for depriving a father of his child. ''Integrity,'' as defined in the Standard Dictionary, means: ''Uprightness of character and soundness of moral principle; honesty; probity; as, his business career showed his integrity.'' In this finding the court evidently did not use the word ''integrity'' in the sense that it meant uprightness of character and soundness of moral principle, for the court has expressly found that the father is not an immoral man. The court must have used the word ''integrity'' in the sense that the father was not honest in his business transactions. But we know of no principle of law which would authorize a court to take a child away from a father because there was evidence of the father's dishonesty in his business transactions.

So, the only matter left for consideration is the finding that the father is a man of insobriety and intemperate habits and is addicted to the use of intoxicating liquors. Just what the court meant by this statement it is difficult to understand; but reading the finding in connection with the evidence, the latter shows that certain parties testified that about four years prior to the time the case was tried in the probate court the father's reputation for sobriety was bad.

There was some evidence that at times he became a little hilarious, but this was all. There was no evidence that the father drank to excess, or that his drinking had a demoralizing or degrading effect upon him, or that it unfitted him to associate with his children or would in any way degrade them.

Intemperance might unfit a person to have the custody of his minor children, but to do so it should clearly appear that the parent was so intemperate that he was an habitual drunkard, and that his conduct would have a tendency to demoralize and degrade his children. This, however, the court does not find, and there is no evidence whatever to support such conclusion. On the contrary, the court did find that the father was not immoral, and was capable of providing for his minor children and educating them. This finding, taken in connection with the finding that the father was intemperate, would clearly indicate that such intemperance did not render the father unfit to provide for and educate his children and did not result in immorality. If so, there was no legal reason why the father should be denied the custody of his children.

Petition for rehearing *denied.*.

Sullivan, C. J., concurs.

AILSHIE, J., Concurring.—In concurring in the order denying a rehearing in this case, I desire to make some special reference to the case of *Andrino v. Yates,* 12 Ida. 618, 87 Pac. 787, on which case petitioner appears to have placed his reliance for an affirmance of the judgment in the present case. Being not only familiar with the opinion in that case, but with the record made on which the opinion was written, I desire to call special attention to the salient features of that case which are radically different from the facts in the case at bar. In that case the mother, who had deserted two husbands, and was living with the third, and who had been somewhat of a rambler herself, abandoned her infant daughter at the age of about eight months, and did not thereafter see her or demand or undertake to resume

her custody for nearly twelve years; neither did she contribute anything more than a few pittances toward the maintenance, care or comfort of the child. When she first left the child she made some temporary provision for its care but very soon neglected that entirely, and the child was thereafter left to the care of strangers and such care as the father could give it for the couple years he lived. Thereafter the child was in the care and custody of its aunt, Mrs. Yates, who was finally appointed its guardian by the probate court. Subsequent to the appointment of Mrs. Yates as guardian of the child, the mother, Mrs. Andrino, applied to this court for a writ of *habeas corpus.* This court examined both the mother and child in open court and heard other witnesses. It there appeared clearly and satisfactorily to the court, as stated in that opinion, that "her original legal right as mother was abandoned, forfeited or surrendered" by her continuous conduct running through a period of nearly a dozen years, and that she could not at that late date be heard to reassert her maternal right as the natural guardian of the child "to the manifest injury of the child"; that "her strict legal custody has ceased to be a rightful custody, and she is equitably estopped from asserting it as a legal right."

In that case the principle of both abandonment and estoppel were invoked against the mother. Her alleged unfitness on other grounds and for other reasons were considered merely as incidental and cumulative reasons for not restoring to her the custody of a child then a dozen years old that she had for more than eleven years abandoned to the mercies, charity and good offices of strangers and relatives. Her actual unfitness for its custody at the time was not the real reason for denying her its custody. Upon consideration of these questions, and of the decisive points upon which the Andrino case turned, it must at once be apparent that the case at bar differs essentially and materially from that case. Here the father never abandoned the children. The fact that he left his wife for a time in no sense constituted an abandonment of his minor children. They were in the cus-

tody of their mother, who appears to have taken the best of care of them. He had no quarrel with the mother, but his quarrel was with the mother in law and father in law. During all this time he was contributing abundantly, and in fact all of his earnings, for the care and maintenance of the mother and children. As soon as the mother died, he at once asserted his natural and legal right to the care and custody of his minor children.

Passing briefly to the grounds of incompetency urged in this case, I will say that no case has ever been called to my attention where a parent was denied the custody of his or her minor children on the grounds of dishonesty in business dealings, or of untruthfulness or failure to pay debts and legal obligations. If that were a legal ground for taking a man's child away from him, it would certainly play havoc with the homes of some very prominent men in the business, commercial and social world, if we can rightly judge from the records that are daily brought before us in civil actions. I have no doubt, on the other hand, but that drunkenness is a ground for depriving a father of the custody of his children. The question of the degree and extent of the habit must determine in every case the fitness or unfitness of the parent to continue the care and custody of his children. What to my mind might seem to disqualify one from continuing the care and custody of his children, might not be considered sufficient by someone else. But it is clear to me that whenever a man becomes so addicted to the use of intoxicating drink that he can be classed as an inebriate or habitual drunkard, or as dangerous to the physical or moral welfare of his children by reason of his violent character or of his immoral habits and practices, he is no longer fit to have the custody of children. In this case, however, the evidence does not show that the father is a drunkard, or that he is addicted to the use of intoxicating drink at the present time, or ever has been, except occasionally. It is true a doctor testified that he had seen him when he was drinking and that Crocheron became "hilarious." Now, if this word "hilarious" does not have a bar-room meaning that differs

from its ordinary English meaning as defined in the lexicons, it does not imply that he was in a drunken condition. It should also be remembered that in this kind of case the question is not a man's reputation but his actual conduct that must be the test.